OPINION
{¶ 1} Defendant-appellant, Quadravious Q. Sutton, appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court, pursuant to a jury trial, convicted appellant on two counts of robbery with a firearm specification, one count of theft with a firearm specification, one count of theft without a firearm specification, and one count of: (1) aggravated burglary with a firearm specification; (2) *Page 2 
aggravated robbery with a firearm specification; (3) kidnapping with a firearm specification; (4) felonious assault with a firearm specification; (5) receiving stolen property; and (6) tampering with evidence.
 {¶ 2} On July 21, 2005, the Franklin County Grand Jury indicted appellant on: one count of aggravated burglary, a first-degree felony, in violation of R.C. 2911.11; one count of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01; one count of robbery as a second-degree felony and another as a third-degree felony, in violation of R.C. 2911.02; (4) one count of kidnapping, a first-degree felony, in violation of R.C. 2905.01; (5) one count of felonious assault, a second-degree felony, in violation of R.C. 2903.11; (6) one count of theft as a third-degree felony and another as a fourth-degree felony, in violation of R.C. 2913.02; (7) one count of receiving stolen property, a fourth-degree felony, in violation of R.C. 2913.51; (8) one count of tampering with evidence, a third-degree felony, in violation of R.C. 2921.12; and (9) one count of carrying a concealed weapon, a fourth-degree felony, in violation of R.C. 2923.12. Each count contained two firearm specifications, pursuant to R.C. 2941.141 and 2941.145, except for the counts of third-degree theft, receiving stolen property, tampering with evidence, and carrying a concealed weapon. The firearm specifications under R.C. 2941.141 carried mandatory one-year prison sentences based on appellant having a firearm while committing the above-noted offenses. The firearm specifications under R.C. 2941.145
carried mandatory three-year prison sentences based on appellant displaying, brandishing, indicating the possession of or using a firearm to facilitate the above offenses. The above charges stem from a July 11, 2005 home *Page 3 
invasion against William Hall and from Hall's vehicle being stolen during the home invasion.
 {¶ 3} Appellant pled not guilty to the charges and filed a motion to suppress: (1) Hall's pre-indictment out-of-court identifications of appellant as a perpetrator in the home invasion; and (2) pre-trial statements appellant made to police. The trial court held a hearing on the motions.
 {¶ 4} At the hearing, plaintiff-appellee, the State of Ohio, called one witness, Whitehall Police Detective Randy Snider. Detective Snider verified that he investigated the July 11, 2005 crimes against Hall. Detective Snider also testified that Whitehall police apprehended appellant between 50 minutes to an hour after the crimes against Hall were initially reported. Detective Snider then testified to the following:
 * * * Hall was seated in the rear seat of a marked police cruiser in the left rear seat, and the vehicle — the cruiser pulled up to the area where I had [appellant] in my hands standing outside in the parking lot of this 1745 Lonsdale area, and * * * Hall then, his window was rolled down in the left rear cruiser seat, and Mr. Hall was then asked if the gentleman that I was holding onto, if he was a person that had been to his apartment and had robbed him inside of his apartment.
 Q. And what did [Hall] say?
 A. He said yes.
 Q. Did you ask him how sure he was?
 A. Yes.
 Q. What did he tell you?
 A. He was positively sure he was one of the people involved. *Page 4 
 Q. How far away was he when he made this identification?
 A. I would say 25 feet.
 Q. To your knowledge, was his identification the result of his own recollection?
 A. That's correct.
(Tr. at 19-21.)
 {¶ 5} Next, Detective Snider testified to the following. On July 12, 2005, Detective Snider asked Hall whether he could identify appellant in a photo array. Hall "quickly selected" appellant, and "indicated he was the first person standing at his door to sell candy. [Appellant] then entered his home and was one of them that assaulted him." (Tr. at 24.) Hall "was positively sure" of his identification. (Tr. at 24.)
 {¶ 6} Detective Snider then testified about appellant's out-of-court statement, as follows. Detective Snider was present when appellant was detained. Detective Snider read appellant his Miranda rights, and appellant indicated that he understood his rights. Detective Snider asked appellant if he would walk with him to a location where police had found a firearm in a grill, and appellant did so. Detective Snider asked appellant if he had placed the firearm in the grill, and appellant responded that Detective Snider would find his fingerprints on it.
 {¶ 7} After Detective Snider finished his testimony, the trial court denied appellant's motion to suppress without asking if the parties wanted to call any more witnesses or introduce any other evidence. However, appellant's trial counsel did not *Page 5 
indicate at the suppression hearing that he had additional witnesses or evidence, and did not object to not being allowed to present witnesses or evidence.
 {¶ 8} Thereafter, a jury trial ensued. At trial, Hall testified to the following on appellee's behalf. Hall is 76 years old and lives in Whitehall, Ohio. On July 11, 2005, while Hall was cleaning his home, the doorbell rang, and Hall answered the door to find a boy and girl selling candy. Hall went to his bedroom to get money for the candy after having locked the door to his home. Hall came back to the door and cracked it open. Hall then testified as follows:
 * * * [T]hey kicked the door in on me. I went up against the wall and I was out of it. And then they started * * * stomping me, kicking me. * * * [H]itting me with their fist. They broke all my false teeth. They broke my hearing aid. And then they took a heavy object and bust me in the head with it * * * And then they put a pillowcase over my head and tied it up and tied my hands and legs and kept on kicking me and kicking me. * * *
 * * *
 A. They were just saying all the time * * * money, money, and just started beating me.
(Tr. at 52-53.) Hall also noted that he lost both of his hearing aids during the incident.
 {¶ 9} Next, Hall provided the following testimony:
 Q. * * * Did you see how many people came into your apartment?
 A. No, I did not. The only thing I can tell you that I saw is the boy and the girl. The other people, you know, there's no window in my door of where I can see out, see who's there.
 * * * *Page 6 
 Q. * * * So were there other people in the apartment that you could hear besides the people that were holding on to you?
 A. No, I could not hear anybody else.
 Q. Do you have a hearing problem?
 A. Yeah.
(Tr. at 53, 57.)
 {¶ 10} Next, Hall testified as follows:
 Q. At some point did these men leave?
 A. Yeah, everybody left.
 Q. Okay. When they left, what did you do?
 A. I woke up, kind of, and I went straight to the phone, I called 9-1-1.
 Q. Okay. When you say you woke up, what do you mean?
 A. I was out of it.
 Q. Why were you out of it?
 A. They hit me in the head with, I don't know what object it was.
(Tr. at 58-59.)
 {¶ 11} Hall testified that, at some point after the incident, he noticed his vehicle was missing. Hall also testified that he noticed missing his "snub-nosed .38 pistol, two-inch barrel" firearm and his "four-inch barrel .38" firearm. (Tr. at 60.) Moreover, Hall identified at trial Exhibit 4 as a pocket watch found on appellant after the home invasion.
 {¶ 12} Hall then testified as follows regarding his identifying appellant as a perpetrator: *Page 7 
 Q. Sir, after the Whitehall police showed up at your apartment, did they ask you to take a ride with them?
 A. Yes, they did, sir.
 Q. And did they take you to a location to see whether or not you could recognize any of the people that had been involved in this incident?
 A. They had one man there, sir.
 * * *
 Q. And did they show you a person?
 A. Yes, they did.
 * * *
 Q. * * * And did you see — when they took you to that place, did you see one of the people who had done this to you?
 A. Yes.
 Q. And did you tell that to the police?
 A. Yes.
(Tr. at 66-67, 69.)
 {¶ 13} Thereafter, Hall identified in court appellant as an individual involved in the incident. In addition, Hall described his identifying appellant in the photo array:
 Q. * * * Did you select a photo off of this photo array?
 A. Yes, I did.
 * * *
 Q. Did the Whitehall police do anything to suggest what picture you picked out?
 A. No, they did not. * * * *Page 8 
 Q. Okay. And did you pick it out all by yourself?
 A. Yes, sir.
 Q. How sure were you?
 A. Sure as I'm sitting here.
(Tr. at 73-74.)
 {¶ 14} Hall also stated the following:
 Q. Sir, we asked you earlier, you said [appellant] was one of the people who came in your house that day; was that right? Is that right?
 A. * * * Now, I think, now what I said, you correct me or not, that this was the man with my truck.
 * * *
 A. — the people that broke into my house I did not see.
 Q. Is [appellant] the man you identified for the Whitehall Police Department back on July 11th?
 A. Yeah.
 * * *
 Q. Okay. And where had you seen him?
 A. Right now, sir, I can't say.
 Q. Well, is he one of the people involved in this incident?
 A. That's the man I seen standing in front of my truck.
(Tr. at 78-79.)
 {¶ 15} Afterwards, Whitehall Police Officer Mark Hopper testified on appellee's behalf that he searched appellant at the police station after appellant's arrest. Officer *Page 9 
Hopper testified that he found a rubber glove and a pocket watch on appellant. Officer Hopper confirmed at trial that Exhibit 4 was the pocket watch that he found on appellant.
 {¶ 16} Whitehall Police Detective John Grebb verified at trial on appellee's behalf that police found Hall's stolen vehicle in a parking lot 10 or 15 minutes from Hall's home. Detective Grebb further noted that police found a latex glove near Hall's stolen vehicle and a box of latex gloves in Hall's home.
 {¶ 17} On cross-examination, Detective Grebb testified that police did not discover any of appellant's fingerprints in Hall's home. On re-direct examination, Detective Grebb indicated that latex gloves would conceal a person's fingerprints.
 {¶ 18} Detective Snider testified to the following on appellee's behalf. On July 11, 2005, Detective Snider responded to a police dispatch on the crimes against Hall. Detective Snider found Hall's stolen vehicle in an apartment complex parking lot. The vehicle was unoccupied, and Detective Snider and other police who arrived for assistance decided to "watch the vehicle to see if it would become occupied so that we could make a connection between suspects in the vehicle and the vehicle which was taken." (Tr. at 120.) Approximately 35 minutes later, Detective Snider saw individuals in the stolen vehicle, which was exiting the apartment complex parking lot. Detective Snider and another police officer tried to apprehend the four individuals in the vehicle, but the individuals fled. Eventually, Columbus Police Officer Danny Dixon apprehended appellant 200 feet from the vehicle. After the apprehension, Detective Snider read appellant hisMiranda rights, and, as noted above, Detective Snider and appellant walked over to a grill near the apartment complex. There was a gun in the grill, and appellant stated that the detective would find appellant's fingerprints on that gun. *Page 10 
Appellant indicated that he obtained the gun from the floorboard of the truck that he just had fled from.
 {¶ 19} While Detective Snider was with appellant in the parking lot where they found the stolen vehicle, Hall arrived in a police cruiser. Appellant was standing with Detective Snider in the parking lot. Detective Snider asked Hall if appellant was the person that was involved in robbing him in his home. Hall indicated affirmatively.
 {¶ 20} On July 12, 2005, Detective Snider showed Hall a photo array. Hall identified appellant in the photo array as a person involved in the home invasion.
 {¶ 21} Halston Clayton testified to the following on appellee's behalf. Appellee charged Clayton with crimes regarding the July 11, 2005 home invasion of Hall. Ultimately, Clayton agreed to testify against appellant in exchange for appellee recommending that Clayton serve a 16-year prison sentence instead of a 49-year maximum prison sentence.
 {¶ 22} On July 11, 2005, Clayton, appellant, and other individuals went to Hall's home to tie him up and rob him. When the individuals approached Hall's home, two pretended that they were selling candy while Clayton, appellant, and another were a few steps from the front door. When Hall opened his door, Clayton, appellant, and two others went inside Hall's residence. Clayton and another tied up Hall, and Clayton believed that appellant and another individual went through Hall's personal property.
 {¶ 23} Subsequently, the participants went to one of the individual's apartment to split up everything. Thereafter, four individuals, including appellant and Clayton, went in Hall's vehicle to take it to a "chop shop" to make money from someone who would sell the vehicle parts. (Tr. at 157.) However, as the individuals were leaving the parking lot *Page 11 
of the apartment complex, police stopped in front of the vehicle. At that point, the individuals fled from the vehicle, but police apprehended Clayton. Clayton ultimately told police on July 11, 2005, of his involvement in the crimes against Hall. Lastly, Clayton testified on direct examination that there was no doubt in his mind that appellant was one of the four people who went into Hall's house on July 11, 2005.
 {¶ 24} On cross-examination, Clayton admitted that he initially told police that he and others were in the vehicle in the apartment complex "to go get some weed and cigars for the shells for the weed." (Tr. at 164.) Clayton then testified as follows on cross-examination:
 Q. Okay. So you got yourself a big problem. Now, do we believe what you said then or do we believe what you said now, which lie do you want us to believe?
 A. It doesn't matter to me.
 Q. Okay. Let's not believe any of them then, is that okay?
 A. Yeah.
(Tr. at 167.) However, on re-direct examination, Clayton reiterated that, on July 11, 2005, even before agreeing to testify against appellant, Clayton told police of his involvement in the crimes against Hall. *Page 12 
 {¶ 25} The parties entered into two stipulations. The first stipulation provided:
 * * * [I]f Officer Scott Chamberlin of the Columbus Police Department were called, he would testify that he was a member of the Columbus Police Department back on July 11th of 2005.
 On the above date and time, he responded to a call for assistance from the Whitehall police. They were chasing suspects out of a stolen vehicle involved in an armed robbery * * *.
 Upon arriving, he observed one of the suspects run to the rear of [an apartment]. That suspect, later identified as [appellant], ran up to the rear of the apartment. The suspect was observed placing something inside the black grill, and when he saw Officer Chamberlin, he then fled to the front of the building where he was stopped by Columbus Police Officer Dan Dixon. Officer Chamberlin then went to the rear of the above location and looked inside the grill and found a handgun.
(Tr. at 115-116.)
 {¶ 26} The second stipulation provided:
 * * * [I]f Robin Roggenbeck were called to the stand * * * she would indicate that she works for the Bureau of Criminal Identification and Investigation in London, Ohio.
 She would indicate that she did a latent fingerprint examination with respect to the items submitted by the Whitehall Police Department in this case.
 She would indicate that the latent prints that were submitted were compared with the inked finger and palm prints of * * * [appellant] * * *
 Five [identifications] were made to [appellant], one each to his left index and left middle fingers from * * * the 2002 Avalanche owner's manual; one to his right palm from * * * the Chevy Avalanche front hood passenger side; one to his right palm from * * * the Chevy * * * Avalanche front hood passenger side; one to his right ring finger from * * * the front of the Undercover Arms .38 special in the front grip. *Page 13 
(Tr. at 181-182.)
 {¶ 27} Before the jury deliberated, the trial court granted appellant's trial counsel's motion to dismiss the carrying a concealed weapon charge and the firearm specifications that mandated a three-year prison sentence. The trial court then provided, in pertinent part, the following jury instruction:
 The value of the identification testimony depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later. You should consider whether the witness had the capacity and had adequate opportunity to observe the offender. You may take into account both the strength of the identification and the circumstances under which the identification was made.
 Finally, you must consider the credibility of each identification witness in the same way as any other witness. Decide whether the witness is truthful, consider whether the witness had the capacity and opportunity to make a reliable observation.
(Tr. at 229-230.)
 {¶ 28} After the trial court read its jury instructions, appellant's trial counsel requested a side-bar discussion with appellee and the trial court. At the conclusion of the side-bar discussion, the trial court read the following jury instruction:
 You've heard testimony from Halston Clayton, another person who pleaded guilty to the same crime charged in this case and is said to be an accomplice. An accomplice is one who purposely, knowingly assists, joins another in the commission of a crime. Whether Halston Clayton was an accomplice and the weight to give his testimony are matters for you to determine from all the facts and circumstances in evidence. *Page 14 
 The testimony of an accomplice that is supported by other evidence does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion and require that it be weighed with great caution.
 It is for you, as jurors, in light of all the facts presented to you and from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.
 An accomplice may have special motives in testifying, and you should carefully examine an accomplice's testimony and use it with great caution and view it with grave suspicion.
(Tr. at 249-250.)
 {¶ 29} Ultimately, the jury found appellant guilty of the remaining charges and firearm specifications. The trial court held a sentencing hearing on June 7, 2006. At the sentencing hearing, the trial court merged the robbery convictions in Counts 3 and 4 into the aggravated robbery conviction in Count 2. The trial court then sentenced appellant to ten years imprisonment on the aggravated burglary conviction, ten years on the aggravated robbery conviction, ten years on the kidnapping conviction, eight years on the felonious assault conviction, five years on the third-degree felony theft, twelve months on the fourth-degree felony theft, and five years on the tampering with evidence conviction. In doing so, the trial court imposed the maximum authorized prison sentence on each charge, except for the fourth-degree felony theft charge. See R.C. 2929.14(A).
 {¶ 30} Next, the trial court sentenced appellant to one year imprisonment for the firearm specifications, effectively merging the firearm specifications. The trial court then ordered appellant to serve the firearm specification consecutive to the other sentences. *Page 15 
Likewise, the trial court ordered appellant to serve consecutively the sentences on the aggravated burglary, aggravated robbery, and kidnapping. The trial court ordered appellant to serve the remaining counts concurrently with each other and the other sentences. Overall, the trial court ordered appellant to serve 31 years in prison.
 {¶ 31} On June 8, 2006, the trial court issued a judgment entry journalizing the above-noted sentences. However, in the sentencing entry, the trial court merged the two robbery convictions into the kidnapping conviction, as opposed to merging the two robbery convictions into the aggravated robbery conviction as the trial court noted at the sentencing hearing.
 {¶ 32} Appellant appeals, raising three assignments of error:
 Error No. 1: The trial Court erred, in summarily denying defendant-appellant's pre-trial motion to suppress identification statement, without first hearing testimony from the victim. The Court erroneously permitted hearsay testimony by State's detective to be substituted for failed "identification" testimony of victim, who was subpoenaed available to testify at pre-trial. The victim couldn't identify persons who invaded his home. Victim identified defendant-appellant as: "The man standing in front of my (stolen) truck", two hours after his home was invaded and robbed.
 Error No. 2: The trial Court erred, in giving Jury eyewitness identification and accomplice instructions which, upon their face, conflicted with each other. The manner in which both instructions were separated from each other was confusing to [the] Jury and the content of the accomplice instruction was incorrect after September 17, 1986; particularly since testimony implicating defendant by "accomplice" was not "supported by other evidence".
 Error No. 3: The trial Court erred in sentencing defendant-appellant to a maximum consecutive sentence as to Counts 1, 2 and 5 of the indictment. Defendant-appellant was indicted before the Supreme Court decision in Foster. (See citation). Defendant-appellant was a "first time offender", *Page 16 
who is entitled to Appellate Court review of his sentence, as a matter of right, and pursuant to his rights to due process of law and to be free from cruel and unusual punishment, as set forth in the 5th, 8th and 14th Amendments to the Constitution of the United States, and Article I, Sections 9 and 10, of the Constitution of the State of Ohio.
 {¶ 33} In his first assignment of error, appellant argues that the trial court erred by denying appellant's pre-trial motion to suppress Hall's identifications of appellant as a perpetrator in the July 11, 2005 home invasion. We disagree.
 {¶ 34} When considering a motion to suppress, the trial court assumes the role of the trier of fact and, thus, resolves questions of fact and evaluates witness credibility. State v. Bumside, 100 Ohio St.3d 152,2003-Ohio-5372, at ¶ 8; State v. Albert, Franklin App. No. 06AP-439,2006-Ohio-6902, at ¶ 43. As such, we accept the trial court's findings of fact if they are supported by competent, credible evidence.Bumside at ¶ 8; Albert at ¶ 43. However, we independently determine as a matter of law whether the facts meet the appropriate legal standard.Bumside at ¶ 8; Albert at ¶ 43. In this regard, we apply a de novo review to the trial court's application of the law to the findings of fact. State v. Zax-Harris, 166 Ohio App.3d 501, 2006-Ohio-1855, at ¶ 8; Albert at ¶ 43.
 {¶ 35} Here, as noted above, Hall identified appellant in the July 12, 2005 photo array. Hall also identified appellant in the July 11, 2005 one-person "show up," i.e., an identification procedure where the victim, in a relatively short time after the incident, is shown only one person and is asked whether the victim can identify the perpetrator of the crime. See State v. Patton, Cuyahoga App. No. 88119, 2007-Ohio-990, at ¶ 17.
 {¶ 36} A trial court utilizes a two-step analysis in entertaining a defendant's motion to suppress a pre-trial out-of-court identification.Neil v. Biggers (1972), *Page 17 409 U.S. 188, 196-200. First, the trial court determines whether the identification procedure was impermissibly suggestive. Id. at 196-197. Second, if the procedure was impermissibly suggestive, then a court must determine if the identification was reliable despite its suggestive character. Id. at 199. In determining the reliability of the identification, the court considers factors such as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson v.Brathwaite (1977), 432 U.S. 98, 114. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Id.
 {¶ 37} Generally, a defendant has the burden of proving that an identification procedure was impermissibly suggestive and that the identification was unreliable. See Albert at ¶ 45; State v.Merriman, Franklin App. No. 04AP-463, 2005-Ohio-3376, at ¶ 16. This burden consists of the burden of production and the burden of persuasion. See State v. Greene (Apr. 12, 1979), Scioto App. No. 1211. If a defendant successfully establishes that an identification procedure was impermissibly suggestive and that the identification was unreliable, due process requires that a trial court suppress evidence of a witness' prior identification of the defendant. State v. Murphy,91 Ohio St.3d 516, 534, 2001-Ohio-112.
 {¶ 38} We first address the July 11, 2005 one-man "show up" identification. Although a one-man "show up" identification procedure is "inherently suggestive[,]" an identification from such a "show up" is admissible if the identification is reliable. State v. Parrish, Montgomery App. No. 21206, 2006-Ohio-4161, at ¶ 15. As recognized inAlbert *Page 18 
and Merriman, appellant had the burden to prove the inadmissibility of Hall's identification of appellant in the one-man "show up," which included proof that the identification was unreliable. SeeAlbert at ¶ 45; Merriman at ¶ 16.
 {¶ 39} In State v. Williams (May 12, 1982), Hamilton App. No. C-810494, the First District Court of Appeals examined a trial court's decision to deny a defendant's motion to suppress a two-man "show up" identification. In Williams, police, responding to a robbery report, apprehended the defendant, handcuffed him, and took him to the robbery scene. At the scene, police presented the defendant "along with another suspect to the victim and several other eyewitnesses, all of whom identified" the defendant and the other suspect as the robbers.
 {¶ 40} In examining the trial court's decision to deny the defendant's motion to suppress the identification, the appellate court inWilliams noted that "[n]one of the eyewitnesses testified at the suppression hearing. The record is devoid of any inquiry about whether any one or more of them were improperly induced to make a mistaken identification, or on the other hand, had a reliable, independent basis for their identification."
 {¶ 41} The appellate court then recognized that the defendant had the burden of proving that the "show up" identification procedures were impermissibly suggestive and that the identification was unreliable. Next, the appellate court concluded that, assuming the procedure was impermissibly suggestive, the defendant nonetheless failed to prove that the identification was unreliable. In concluding as such, the appellate court reiterated the absence of any testimony on the reliability issue. Thus, *Page 19 
the appellate court concluded that the trial court properly denied the defendant's motion to suppress the identification.
 {¶ 42} Here, like Williams, regardless of whether the "show up" was impermissibly suggestive, appellant failed to prove that Hall's identification from the "show up" was unreliable. Indeed, appellant presented no testimony at the suppression hearing to suggest the unreliability of the identification. While Hall later testified at trial that "the people that broke into my house I did not see[,]" appellant did not present such testimony at the hearing on the motion to suppress, and we limit our examination of appellant's motion to evidence adduced at the suppression hearing. (Tr. at 78.) See State v. Gammons, Cuyahoga App. No. 87268, 2006-Ohio-4766, at ¶ 2, fn. 1; State v. Conrad (Sept. 30, 1997), Portage App. No. 96-P-0218.
 {¶ 43} Instead, Detective Snider provided the only testimony at the suppression hearing and, thus, provided the only evidence regarding the reliability of Hall's identifications of appellant. Detective Snider testified that, during the "show up" when Hall identified appellant as a perpetrator, Hall "was positively sure [appellant] was one of the people involved[,]" and Detective Snider testified that, to his knowledge, Hall's identification was the result of Hall's own recollection. (Tr. at 20.)
 {¶ 44} Although Detective Snider related hearsay when testifying about Hall's identification of appellant, the trial court was permitted to consider such hearsay at the pre-trial suppression hearing. Under Evid.R. 104(A), "the admissibility of evidence shall be determined by the court * * *. In making its determination it is not bound by the rules of evidence except those with respect to privileges." Thus, a trial court may rely on hearsay at suppression hearings even though such evidence would not be admissible at *Page 20 
trial. State v. Edwards, 107 Ohio St.3d 169, 2005-Ohio-6180, at ¶ 14;United States v. Raddatz (1980), 447 U.S. 667, 679. Moreover, we emphasize that, even without Detective Snider's testimony, appellant failed to provide any evidence suggesting the unreliability of Hall's identification.
 {¶ 45} In so concluding, we note appellant's argument that "[t]he Court * * * erred in summarily dismissing defendant-appellant's motion to suppress his identification and statement, after the State merely offered the direct (hearsay) testimony of Whitehall Police Detective Snider; rather than requiring the actual identification testimony of the alleged victim, before ruling on the merits of defendant-appellant's motion to suppress his identification (and statement)." However, the record does not demonstrate that appellant's trial counsel wanted Hall to testify at the suppression hearing or that the trial court would have refused Hall's testimony had appellant's trial counsel called Hall to testify. Ultimately, it was appellant's trial counsel who failed to call Hall in support of appellant's burden on the motion to suppress.
 {¶ 46} In the final analysis, given Detective Snider's testimony and the absence of other testimony at the suppression hearing to suggest the unreliability of Hall's identification of appellant, we conclude that the trial court did not err by declining to suppress the "show up" identification.
 {¶ 47} We next address the July 12, 2005 photo array identification. At first glance, we note that appellant does not contend on appeal, nor did appellant contend during the suppression hearing, that the photo array was impermissibly suggestive. Indeed, we decline to conclude as such given that the photo array contained individuals *Page 21 
of the same sex and race, and the individuals in the photo array appeared to be similar in age and had similar short haircuts.
 {¶ 48} In this regard, if, as with the photo array here, a pre-trial confrontation procedure was not impermissibly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. State v. Lee, Franklin App. No. 06AP-226,2007-Ohio-1594, at ¶ 13; State v. Wills (1997), 120 Ohio App.3d 320,325. Alternatively, we note that appellant appears to argue on appeal that the initial "show up" identification tainted and rendered inadmissible the subsequent photo array identification. However, we reject such an argument given, as noted above, appellant's failure to prove at the suppression hearing that the initial "show up" identification was inadmissible.
 {¶ 49} Similarly, appellant appears to argue on appeal that the initial "show up" identification tainted and rendered inadmissible Hall's in-court identification of appellant as a perpetrator in the July 11, 2005 home invasion. Aside from the fact that appellant did not challenge at the pre-trial suppression hearing Hall's ability to make a proper in-court identification, we nonetheless reject appellant's above contention, given appellant's failure to prove at the suppression hearing that the pre-trial identifications were inadmissible.
 {¶ 50} Accordingly, based on the above, we conclude that the trial court did not err by denying appellant's motion to suppress Hall's identifications of appellant as a perpetrator in the July 11, 2005 home invasion. As such, we overrule appellant's first assignment of error. *Page 22 
 {¶ 51} Appellant's second assignment of error challenges the trial court's jury instruction on accomplice credibility. After the trial court finished reading its jury instructions, but before the jury deliberated, the trial court, after a non-transcribed sidebar conversation that appellant's trial counsel requested, informed the jury of an "additional credibility instruction" in regards to accomplice Clayton's testimony. (Tr. at 249.) In the additional instruction, the trial court told the jury to use an accomplice's testimony "with great caution and view it with grave suspicion." (Tr. at 250.)
 {¶ 52} Appellant argues that the trial court prejudiced him by giving the accomplice instruction well after the general witness identification credibility charge. In the general witness identification credibility charge, the trial court told the jury that "you must consider the credibility of each identification witness in the same way as any other witness." (Tr. at 230.) Appellant claims that the jury likely misunderstood the differences between the instructions, and that the trial court risked the jury analyzing accomplice Clayton as a general identification witness rather than an accomplice to be considered "with great caution and view it with grave suspicion." (Tr. at 250.) We disagree.
 {¶ 53} First, although the record does not expressly reflect as much, it appears the trial court gave the accomplice instruction at appellant's trial counsel's request. Regardless, appellant's trial counsel failed to express any objection as to how and when the trial court gave the accomplice testimony instruction. Thus, appellant has waived all but plain error. State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68.
 {¶ 54} According to the plain error doctrine, enunciated in Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations *Page 23 
on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." Barnes at 27. Under the plain error standard:
 * * First, there must be an error, i.e., a deviation from a legal rule. * * * United States v. Olano (1993), 507 U.S. 725, 732 * * * (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * [S]ee, also, Olano, 507 U.S. at 734 * * * (a plain error under Fed.R.Crim.P. 52[b] is "`clear' or, equivalently, `obvious'" under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *
Id.
 {¶ 55} The Ohio Supreme Court has further stated:
 Even if a forfeited error satisfies [the above noted] three prongs [of the plain error doctrine], Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court "may" notice plain forfeited errors; a court is not obliged to correct them. * * *
Id.; see, also, State v. Martin, 103 Ohio St.3d 385, 2004-Ohio-5471, at ¶ 52 (Moyer, C.J., concurring) (recognizing that "[e]ven if the defendant establishes that plain error affected his substantial rights, the appellate court need not necessarily reverse the judgment of the trial court"). Thus, the Ohio Supreme Court has "admonish[ed] courts to notice plain error `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'"Barnes at 27, quoting State v. Long (1978), 53 Ohio St.2d 91.
 {¶ 56} Here, the trial court differentiated between the two above-noted instructions by specifically naming Clayton as an accomplice covered under the *Page 24 
accomplice credibility instruction. In doing so, the trial court highlighted that the jury was not to view Clayton's testimony under the same standard as other witnesses. See State v. Spicer (Mar. 12, 1999), Richland App. No. 97-CA-31. Rather, the trial court emphasized that the jury was to consider Clayton's testimony "with great caution and view it with grave suspicion." (Tr. at 250.) Pursuant to State v. Noling,98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 39, we presume that jurors follow the trial court's instructions, and we find no error, let alone plain error, with the trial court providing the accomplice credibility instruction at the time that it did.
 {¶ 57} Next, appellant challenges the following language in the trial court's jury instruction on accomplice credibility:
 The testimony of an accomplice that is supported by other evidence does not become inadmissible because of his complicity, moral turpitude, or self-interest * * * *Page 25 
(Tr. at 249-250.) Again, appellant's trial counsel did not object to such language in the accomplice credibility jury instruction, and we review appellant's argument under the plain error standard.Barnes at 27.
 {¶ 58} The trial court gave the above accomplice credibility instruction, pursuant to R.C. 2923.03(D), which states:
 If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
 "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
 It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."
 {¶ 59} Here, the trial court's accomplice credibility instruction mirrored R.C. 2923.03(D), except for the sentence, "[t]he testimony of an accomplice that is supported by other evidence does not become inadmissible because of his complicity, moral turpitude, or self-interest[.]" (Emphasis added.) (Tr. at 249-250.) Appellant claims that the trial court erroneously included the language "that is supported by other evidence" because corroboration of accomplice testimony is not required. See State v. O'Dell (1989),45 Ohio St.3d 140, 145 (noting that in accordance with R.C. 2923.03[D] there is no statutory requirement of corroboration of an accomplice's testimony); cf. R.C. 2923.01(H)(1) (stating that "[n]o person shall be convicted of conspiracy upon the *Page 26 
testimony of a person with whom the defendant conspired, unsupported by other evidence").
 {¶ 60} In particular, appellant argues that the trial court improperly bolstered Clayton's testimony by including the language "[t]he testimony of an accomplice that is supported by other evidence[.]" Appellant claims that no evidence supported Clayton's testimony that appellant was a perpetrator in the July 11, 2005 home invasion, given that Hall eventually testified that he did not see who broke into his house. However, regardless of the fact that Hall's initial testimony identifying appellant as a perpetrator in the July 11, 2005 home invasion was not stricken from the record and not removed from the jury's consideration, we note that some evidence did support Clayton's testimony that appellant was a perpetrator in the July 11, 2005 home invasion. In particular, after appellant's arrest, police found a rubber glove on appellant, rubber gloves in Hall's home, and a rubber glove near Hall's stolen vehicle. Given such circumstances, the jury could conclude that appellant was present during the home invasion, as Clayton so testified. Likewise, appellant's possession of Hall's property, while establishing the receiving stolen property charge, also evinced appellant's involvement in the July 11, 2005 home invasion, especially considering that appellant can be placed at the scene through his possession of a rubber glove in combination with police finding a box of rubber gloves at Hall's home. Accordingly, we find no prejudice to appellant by the trial court's inclusion of the above-noted language to the accomplice credibility instruction.
 {¶ 61} Moreover, we emphasize that "R.C. 2923.03(D) explicitly permits substantial compliance with the accomplice testimony instruction."State v. Fitzgerald, Portage App. No. 2003-L-084, 2004-Ohio-6173, at ¶ 31. Thus, a trial court does not *Page 27 
commit error solely because it does not literally comply with R.C.2923.03(D). Fitzgerald at ¶ 31. Rather, a trial court substantially complies with R.C. 2923.03(D) by alerting the jury that accomplice testimony should be viewed with "grave suspicion" and "weighed with great caution." Fitzgerald at ¶ 35.
 {¶ 62} Here, the trial court's accomplice credibility instruction used the key phrases to warn the jury to view accomplice testimony with "grave suspicion" and to weigh the testimony "with great caution[.]" Therefore, we conclude that the trial court's accomplice credibility instruction was sufficient to accomplish the requisite warning embodied in R.C. 2923.03(D).
 {¶ 63} Therefore, based on the above, we find no plain error in the trial court's accomplice credibility instruction that included language regarding "testimony of an accomplice that is supported by other evidence[.]" (Tr. at 249-250.) Having also found no plain error in the timing of the accomplice credibility instruction, we overrule appellant's second assignment of error.
 {¶ 64} In his third assignment of error, appellant challenges his maximum consecutive sentences. In doing so, appellant argues against the retroactive application to his sentences of the Ohio Supreme Court's February 27, 2006 decision in State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856. Although the trial court sentenced appellant after the Ohio Supreme Court decided Foster, appellant was indicted beforeFoster.
 {¶ 65} In Foster, the Ohio Supreme Court concluded that portions of Ohio's felony-sentencing statutes violate jury trial rights guaranteed by the Sixth Amendment to the United States Constitution.Foster at ¶ 50-83. Specifically, the court stated that, under certain circumstances, the felony-sentencing statutes unconstitutionally require a *Page 28 
trial court to make "specific findings before imposing a sentence beyond that presumed solely by a jury verdict or admission of a defendant." Id. at ¶ 54. The Ohio Supreme Court then severed from Ohio's felony-sentencing laws the unconstitutional statutes, including R.C.2929.14(C) and (E)(4) and 2929.19(B)(2), which, in combination, required a trial court to make findings and explanations before imposing maximum consecutive sentences. Id. at ¶ 99. As a result, pursuant toFoster, trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum consecutive sentences. Id. at ¶ 100.
 {¶ 66} Here, the trial court sentenced appellant after Foster under its full discretion to impose a prison sentence within the statutory range. Appellant argues that pre-Foster, courts issued sentences on a sentencing scheme that did not provide such full discretion and that such full discretion from the Foster severance violated his constitutional rights to due process and against ex post facto laws. Accordingly, appellant contends that these constitutional rights require that the Foster severance not apply to him.
 {¶ 67} However, in State v. Satterwhite, Franklin App. No. 06AP-666,2007-Ohio-798, at ¶ 18, we rejected the exact constitutional arguments that appellant raises here. Specifically, in Satterwhite, we concluded that the Foster severance remedy does not violate a defendant's due process rights or right against ex post facto laws because defendants, like appellant, had notice "`of the potential sentences at the time they committed their crimes, and because the remedial holding ofFoster was not unexpected[.]'" Satterwhite at ¶ 18, quoting State v.Houston, Franklin App. No. 06AP-662, *Page 29 2007-Ohio-423, at ¶ 4. Lastly, in rejecting the above-noted constitutional arguments, we stated that "`it is unlikely the Ohio Supreme Court [in Foster] would direct inferior courts to violate the constitution, and, in any event, inferior courts are bound by Ohio Supreme Court directives.'" Satterwhite at ¶ 18, quotingHouston at ¶ 4.
 {¶ 68} Lastly, we note that, in his third assignment of error, appellant references his right to be free from cruel and unusual punishment under the federal and state constitutions. However, appellant does not address this argument in his brief. App.R. 16(A)(7) states, in relevant part, that an appellant's brief shall include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions[.]" App.R. 12(A)(2) states that "the court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."
 {¶ 69} Accordingly, here, pursuant to App.R. 12(A) and 16(A), we decline to address appellant's cruel and unusual punishment argument, given that appellant failed to present "reasons in support of the contentions" behind the argument. Having also rejected above appellant's other constitutional arguments concerning his maximum consecutive sentences, we overrule appellant's third assignment of error.
 {¶ 70} In summary, we overrule appellant's first, second, and third assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 TYACK and BOWMAN, JJ., concur. *Page 1