OPINION *Page 2 
{¶ 1} Defendant-appellant, Michael Bell, appeals from a Mahoning County Common Pleas Court judgment convicting him of one count of aggravated burglary, one count of attempted rape, three counts of rape, and three counts of kidnapping following a jury trial and his resulting sentence.
 {¶ 2} During the fall of 2005, four women were attacked on Youngstown's south side. Police dubbed the attacker the "south side rapist."
 {¶ 3} On September 15, T'Licia Shine was approached by a man while she was walking down Hillman Street. He struck up a conversation with her. Eventually, the man grabbed Shine around the neck, dragged her behind a house, and raped her. Although her attacker was wearing a "hoodie," Shine was able to see his face. She later picked appellant out of a photo lineup as her attacker.
 {¶ 4} On October 7, Kim Stone came home to her apartment on Fernlee Avenue. She realized she was locked out and, after staying at her neighbor's apartment for a while, she decided to wait on her porch for her boyfriend to arrive home with the key. When it started to rain, Stone decided to go back to her neighbor's apartment. As she was walking down the driveway, she noticed a man standing there. She asked him what he was doing and he told her that he was going to see her neighbor also. Stone then went up the steps to her neighbor's apartment. She knocked on the door, but no one answered. When Stone turned to walk back down the stairs, the man grabbed her from behind and put her in a chokehold. The man dragged Stone into the backyard and then to the side of the garage. The man forced her to perform oral sex on him. Although it was dark, Stone was able to get a brief look at her attacker. She later picked appellant out of a photo lineup. *Page 3 
 {¶ 5} On October 22, Laura Howard was approaching the back door of her house on Hudson when a man came up behind her, covered her mouth, and choked her. She fought with the man and struggled with him until they reached her neighbor's house. The man hit her in the face with a gun. When Howard realized that the man was going to rape her, she asked him if she could at least retrieve a condom from her house. He agreed. The man took her by the throat and followed her into her house. Howard retrieved the condom and the man subsequently raped her. She never saw his face.
 {¶ 6} On October 23, Jasmine Flores, who lived on West Boston, was walking down her street and stopped to talk to her neighbors. Appellant was sitting on her neighbors' porch with them. Later that night, appellant knocked on Flores's door and told her that her neighbor wanted to see her. She told him to tell the neighbor to come over and appellant left. The neighbor never came over. Approximately an hour later, while Flores was relaxing on her living room couch, she noticed a figure in her doorway. She identified the figure as appellant. He rushed in, placed his leg on top of her leg, put his hands on her shoulders, and kissed her. Flores pushed him off of her and managed to fight him out of her house. Flores later found out appellant's name and where he lived. She then called the police and reported what had happened to her. She told the police appellant's name and where to find him.
 {¶ 7} Police subsequently arrested appellant. They then asked Flores to identify him as her attacker, which she did. DNA evidence subsequently connected appellant to Shine's, Stone's, and Howard's rapes.
 {¶ 8} On November 3, 2005, a Mahoning County grand jury indicted appellant on one count of aggravated burglary, one count of attempted rape, one count of rape, and one count of kidnapping. A Mahoning County grand jury then issued a superseding indictment on January 12, 2006, indicting appellant a follows: Count One — aggravated burglary, a first-degree felony in violation of R.C. 2911.11(A)(1)(B); Count Two — attempted rape, a second-degree felony in violation *Page 4 
of R.C. 2923.02(A)(E) and R.C. 2907.02(A)(2)(B); Counts Three, Six, and Eight-rape, first-degree felonies in violation of R.C. 2907.02(A)(2)(B); and Counts Four, Five, and Seven — kidnapping, first-degree felonies in violation of R.C. 2905.01(A)(4)(C).
 {¶ 9} The case proceeded to a jury trial. The jury found appellant guilty on all eight counts. The trial court subsequently determined that appellant was a sexual predator. It then sentenced appellant to ten years on Count One, eight years on Count Two, ten years each on Counts Three, Six, and Eight, and ten years each on Counts Four, Five, and Seven. The court ordered appellant to serve all sentences consecutively for a total of 78 years in prison.
 {¶ 10} Appellant filed a timely notice of appeal on December 12, 2006.
 {¶ 11} Appellant raises 11 assignments of error, the first of which states:
 {¶ 12} "THE TRIAL COURT ERRED IN DENYING DEFENDANT/APPELLANT'S MOTION FOR SEPARATE TRIALS."
 {¶ 13} After the grand jury issued the first indictment, appellant filed a motion requesting separate trials on Counts One and Two from Counts Three and Four because Counts One and Two dealt with one victim and Counts Three and Four dealt with a different victim. The trial court overruled appellant's motion. The grand jury then handed down the superseding indictment, which added four more charges and included two additional victims. Appellant did not renew his motion for separate trials.
 {¶ 14} Appellant argues that the trial court should have granted him separate trials. He contends that the cumulative effect of the evidence was prejudicial to him. He asserts that each of the victims either could not identify their attacker or only did so based on tainted identification procedures. And appellant argues that given the number of the offenses and the nature of the charges, a trial on all counts together simply served to establish his bad character and criminal disposition.
 {¶ 15} Appellant failed to move for separate trials after the grand jury issued the superseding indictment. It is a well recognized principle of law that an appellant's *Page 5 
failure to raise an error in the trial court constitutes a waiver of that issue on appeal unless it rises to the level of plain error.State v. Underwood (1983), 3 Ohio St.3d 12, 13, 444 N.E.2d 1332. Thus, we will review the trial court's failure to grant separate trials for plain error.
 {¶ 16} "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise."State v. Wickline (1990), 50 Ohio St.3d 114, 120, 552 N.E.2d 913. Furthermore, "[n]otice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
 {¶ 17} Crim. R. 8(A) provides that two or more offenses may be charged in the same indictment if the offenses are (1) of the same or similar character, or (2) are based on the same act or transaction, or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or (4) are part of a course of criminal conduct.
 {¶ 18} In this case, all of the offenses charged in appellant's indictment were of the same or similar character. The offenses charged were all rape, attempted rape, or offenses that accompanied the rapes/attempted rape. Thus, it was proper to join all of the offenses in one indictment.
 {¶ 19} Crim. R. 14 provides that if it appears that a defendant is prejudiced by the joinder of offenses in an indictment for trial, the court shall order an election or separate trial of counts or provide such other relief as justice requires.
 {¶ 20} If a defendant claims the court erred in refusing to allow separate trials of multiple charges, he has the burden of affirmatively showing that his rights were prejudiced. State v. Torres (1981),66 Ohio St.2d 340, 343, 421 N.E.2d 1288. "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of *Page 6 
each crime is simple and distinct." State v. Schaim (1992),65 Ohio St.3d 51, 59, 600 N.E.2d 661.
 {¶ 21} In this case, evidence of the other crimes pertaining to other victims would likely not have been admissible had the court severed appellant's trials by victim. However, the joinder was nonetheless appropriate because the evidence of each crime was simple and distinct. As will be seen in greater detail below, each of the four victims took the stand and testified as to their attack. Three of the victims, Shine, Stone, and Flores, identified appellant as their attacker, both in court and in out-of-court identifications. Additionally, the state presented DNA evidence showing that appellant was the likely source of semen or seminal fluid found on swabs taken from Shine, Stone, and Howard. The rest of the evidence presented dealt with the chain of custody for certain evidence and the police officers' investigations involving each of the four victims. None of the victims testified regarding the circumstances of the other victims. None of the evidence was overly complicated. And much of the evidence was direct evidence as opposed to circumstantial evidence. Thus, joinder of the offenses for trial was proper.
 {¶ 22} Importantly, appellant cannot demonstrate that had he had four separate trials instead of one joint trial, that the outcome would have been any different. All of the victims would have still testified as to their attacks. Three out of the four victims would have still identified appellant as their attacker. And DNA evidence would have still linked appellant to three of the four victims, including the victim who could not identify him.
 {¶ 23} Thus, it was not plain error for the court to hold a joint trial for appellant. Accordingly, appellant's first assignment of error is without merit.
 {¶ 24} Appellant's second assignment of error states:
 {¶ 25} "THE TRIAL COURT ERRED IN ADMITTING THE DNA EXPERT OPINION TESTIMONY."
 {¶ 26} Appellant argues that two expert witnesses should not have testified regarding DNA evidence because they were not qualified. *Page 7 
 {¶ 27} A potential expert need not be the best witness on the subject but must only demonstrate knowledge greater than that possessed by an average juror. State v. DeWalt, 7th Dist. No. 06-CA-835, 2007-Ohio-5245, at ¶ 14. Evid. R. 702 governs the admissibility of expert testimony. It provides:
 {¶ 28} "A witness may testify as an expert if all of the following apply:
 {¶ 29} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 30} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 31} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 32} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 33} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 34} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 35} In this case, appellant did not object to any of the expert testimony he now takes issue with. Thus, this assignment of error will be reviewed for plain error.
 {¶ 36} Appellant first argues that the trial court should not have permitted DNA expert Russell Edelheit to testify because he only gave a brief summary of his education and experience, which appellant contends, was not in compliance with Evid. R. 702(B). Additionally, appellant argues that Edelheit's testimony regarding the procedures and protocols used in his laboratory did not meet the requirements set out in Evid. R. 702(C). *Page 8 
 {¶ 37} Edelheit did testify as to his education and experience. He stated that he received his Bachelor of Science degree in microbiology from the University of Iowa. (Tr. 486). He further stated that he received his Masters of Forensic Science with a concentration in forensic molecular biology from George Washington University in Washington, D.C. (Tr. 486). Edelheit testified that he has worked as a forensic scientist in the forensic biology DNA section of the Ohio Bureau of Criminal Identification and Investigation (BCI) since July 2003. (Tr. 485-86). He further explained that his duties included identifying and characterizing bodily fluids, performing DNA analysis on those fluids, and comparing the profiles to known reference standards in order to include or exclude individuals from being DNA contributors. (Tr. 486). This testimony was sufficient to qualify Edleheit as an expert in DNA analysis. He demonstrated that he has specialized education and experience regarding DNA analysis, which was the subject of his testimony.
 {¶ 38} Furthermore, Edelheit also testified as to the procedures and protocols used at BCI for DNA testing. Edelheit testified that when he conducts DNA tests he follows BCI's protocols. (Tr. 489). He stated that these protocols are nationally accepted. (Tr. 489). As to the integrity of the testing machines, Edelheit testified that he follows strict guidelines to ensure quality. (Tr. 489). He stated that he runs controls through every step of the analysis to make sure that the tests are working properly. (Tr. 489). And he stated that his work is 100 percent peer reviewed by another DNA analyst and a supervisor. (Tr. 489). Furthermore, Edelheit testified in detail about DNA, what he looks for when comparing DNA, and the types of tests he runs on DNA. (Tr. 486-88). This testimony comports with Evid. R. 702(C). Edelheit explained the test he used, stated that the protocols he follows are nationally accepted, and clarified how the results of his tests are verified as accurate.
 {¶ 39} Consequently, the trial court did not commit plain error in permitting Edelheit to testify as an expert.
 {¶ 40} Second, appellant argues that the court erred in permitting DNA expert Cassie Johnson to testify because she did not satisfy Evid. R. 702(C). And he *Page 9 
contends that Johnson's testimony was improper because at the time she testified, the swabs that were the subject of her analysis had not yet been admitted into evidence. Thus, appellant contends that there was no foundation for Johnson's testimony.
 {¶ 41} Johnson testified that she is a forensic DNA analyst for a company called Orchid Cellmark. (Tr. 41). Appellant does not take issue with her qualifications as an expert as he did with Edelheit. Instead, he contends that she did not demonstrate that her testimony was based on reliable scientific information and a reliable procedure. However, Johnson's testimony satisfies appellant's concerns. Johnson testified that in this case she performed a specific type of testing known as Y-STR testing. (Tr. 43). She explained what this type of test looks for. (Tr. 43). Johnson stated that she has worked on 350 to 400 Y-STR cases. (Tr. 43). Johnson explained how she extrapolates DNA cells from the evidence submitted and described the equipment used to do so. (Tr. 44). She stated that she follows standard operating procedures, which are followed every time an analysis is done at Orchid Cellmark. (Tr. 45). She further stated she uses several controls throughout the testing procedure to ensure that the tests are working properly and so that the results are reliable. (Tr. 45).
 {¶ 42} Given this testimony, the trial court did not commit plain error in allowing Johnson to testify. Johnson testified regarding the type of test she performed and how she went about performing it. She further explained how she can be sure the results of her tests are reliable and stated that she follows standard protocol in performing the tests.
 {¶ 43} Appellant also takes issue with the fact that Johnson testified regarding swabs that had not yet been admitted into evidence. While this may be so, the swabs were later introduced and admitted into evidence. (Tr. 268; State Ex. 33). While the state may have proceeded out of order, the swabs were introduced and admitted. Thus, no plain error exists here. *Page 10 
 {¶ 44} Finally, appellant contends that the trial court erred in permitting Detective Susan Ellis to testify as to a DNA confirmation before any experts testified on the subject. (Tr. 259).
 {¶ 45} Appellant's allegation here is simply untrue. Johnson was the first witness to testify. She testified that based on the DNA found on the vaginal swab taken from Howard, appellant or a male relative of appellant's could not be excluded as the source of the DNA. (Tr. 47). She said that because the type of test she performed cannot delineate males from the same lineage, such as father and son, she uses the term "cannot be excluded" instead of saying that the DNA matches. (Tr. 65).
 {¶ 46} On re-direct examination, Detective Ellis testified that a warrant was not immediately issued for appellant's arrest in Howard's case after he was apprehended. (Tr. 259). This was because police needed to get DNA evidence first since Howard was not able to identify appellant. (Tr. 259). She stated that police did not issue a warrant for appellant in Howard's case until they received confirmation that appellant was a DNA match. (Tr. 259). This testimony came well after Johnson's testimony. Thus, appellant's assertion is this regard is incorrect.
 {¶ 47} Based on the above, appellant's second assignment of error is without merit.
 {¶ 48} Appellant's third assignment of error states:
 {¶ 49} "THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE TESTIMONY REGARDING THE PHOTO ARRAY IDENTIFICATION OF DEFENDANT/APPELLANT BY T'LICIA SHINE AND KIM STONE AS WELL AS THE IMPROPER SHOW UP IDENTIFICATION TESTIMONY OF DEFENDANT/APPELLANT BY JASMINE FLORES."
 {¶ 50} In this assignment of error, appellant takes issue with the victims' identifications of him. *Page 11 
 {¶ 51} Once again, as plaintiff-appellee, the State of Ohio, points out, appellant failed to raise objections in the trial court regarding the identifications. Therefore, this assignment of error will be reviewed for plain error.
 {¶ 52} When determining whether an out-of-court identification is admissible, a trial court uses a two-step approach. Neil v. Biggers
(1972), 409 U.S. 188, 196-200, 93 S.Ct. 375, 34 L.Ed.2d 401. The court first determines whether the identification procedure was impermissibly suggestive. Id. at 196-97. Then, if the procedure was impermissibly suggestive, the court must determine if the identification was reliable despite being suggestive. Id. at 199.
 {¶ 53} Appellant first asserts that the trial court should not have admitted the show-up identification of him by Jasmine Flores because when Flores saw him, he was handcuffed in the back of a police cruiser wearing a blue hooded sweatshirt that had been reported in several of the crimes.
 {¶ 54} A "show up" is an identification procedure where the victim, shortly after the incident, is shown only one person and is asked whether the victim can identify the perpetrator of the crime. State v.Tanksley, 10 Dist. No. 07AP-262, 2007-Ohio-6596, at ¶ 9. While this one-man show-up identification procedure is inherently suggestive, a witness's identification from such a show up is admissible if the identification is reliable. State v. Sutton, 10th Dist. No. 06AP-708,2007-Ohio-3792, at ¶ 38.
 {¶ 55} In this case, Flores identified appellant at a show up. However, her identification was reliable. Flores saw appellant sitting on her neighbor's porch earlier on the day of her attack. (Tr. 179-80). She saw him again later that night when he knocked on her door. (Tr. 180-81). When her attacker rushed into her living room, pinned her down, and kissed her, it was the third time that day that Flores saw him. (Tr. 185). Flores later learned appellant's name and address and informed the police. The police subsequently arrested appellant and took him to Flores's house. (Tr. 229). Flores then identified appellant as her attacker. (Tr. 189, 229). At the time, appellant was in the back of an unmarked police car and remained *Page 12 
seated so that Flores would not have been able to see that his hands were cuffed. (Tr. 251). Additionally, when Flores identified appellant, she remarked that he was wearing the same "blue hoodie" that he was wearing when he broke into her house. (Tr. 229).
 {¶ 56} Flores observed appellant on three separate occasions. And on two of these occasions Flores was not under the stress of being attacked. Thus, she had ample opportunity to view appellant. Furthermore, since appellant was in an unmarked police cruiser and Flores could not see that his hands were cuffed, these factors could not have influenced her identification of appellant as he suggests. Given these circumstances, it was not plain error to admit Flores's out-of-court identification of appellant.
 {¶ 57} Second, appellant contends that the court should not have admitted evidence by T'Licia Shine regarding photo arrays from which she picked out his picture. He points out that two of the photo arrays contained the same picture of him. Therefore, he contends that they were unduly suggestive. And he asserts that Shine did not have a good opportunity to view her attacker.
 {¶ 58} "If an identification procedure is impermissibly suggestive, then the identification is only admissible if, under all the circumstances, it appears that the identification is `the result of observations at the time of the crime' and, therefore, reliable.State v. Davis, 76 Ohio St.3d 107, 112, 1996-Ohio-0414, citingColeman v. Alabama (1970), 399 U.S. 1, 5-6. The factors to be considered to determine an identification's reliability `include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' Biggers, [409 U.S.] at 199-200." State v. Loveless, 7th Dist. No. 05-JE-60, 2007-Ohio-1560, at ¶ 42.
 {¶ 59} Detective Ellis testified regarding the photo lineups. She stated that she presented Shine with three photo lineups. The first lineup did not contain *Page 13 
appellant's picture. (Tr. 225). Instead, it contained a picture of another possible suspect. (Tr. 225). Shine did not identify anyone in that lineup. (Tr. 225).
 {¶ 60} Detective Ellis later prepared a second lineup with appellant's picture in it. (Tr. 231; State Ex. 12). However, the machine used to prepare the photo lineups was out of order. (Tr. 231). Consequently, the photographs in the lineup were a bit distorted and fuzzy. (Tr. 231). Detective Ellis testified that Shine was unable to identify appellant with complete accuracy in this second photo lineup. (Tr. 232). However, Shine stated that she did pick appellant out of this lineup. (Tr. 84, 95, 98).
 {¶ 61} Because the photos in the second lineup were fuzzy, Detective Ellis prepared a third photo lineup. (Tr. 232; State Ex. 13). She testified that Shine picked appellant out of this lineup. (Tr. 232).
 {¶ 62} With the exception of appellant, the second and third lineups contained different people. (Tr. 262-63). Therefore, when Shine viewed the third photo lineup, it was the second time she saw a lineup with appellant's picture in it. Because the photo of appellant was the only one that remained the same from the second to the third lineup, this would tend to make the third lineup suggestive. The second lineup would not have been suggestive, however, because that was the first time Shine saw appellant's picture in a lineup.
 {¶ 63} Even though the third lineup was suggestive, Shine's identification of appellant was still reliable. Shine had sufficient opportunity to view her attacker. Shine testified that before assaulting her, her attacker walked along the street talking with her for five to ten minutes before anything happened. (Tr. 90). All the while, the man was next to her and she looked at him while they talked. (Tr. 90-91). Shine stated that although it was dark and the man was wearing a hoodie, she was still able to see his face. (Tr. 73). She stated that while she could not see everything, she was able to see his facial features, like his jaw structure. (Tr. 73). She also noticed that he was dark and skinny. (Tr. 73). Additionally, several days later, Shine saw appellant sitting outside on a car in the neighborhood. (Tr. 79-80). She pointed him out to her mother and called the police. (Tr. 80). Given this evidence of Shine's *Page 14 
observations of her attacker before he assaulted her, her identification of appellant was reliable. Therefore, the court did not err in admitting evidence of the photo lineups.
 {¶ 64} Furthermore, although an identification procedure is suggestive, as long as the in-court identification is reliable, it is admissible. State v. Barker (1978), 53 Ohio St.2d 135, 142,372 N.E.2d 1324. In this case, Shine also identified appellant in court. (Tr. 85). Thus, even though the third photo lineup may have been suggestive, Shine's in-court identification was admissible, especially based on her earlier observations. So had the court suppressed evidence regarding Shine's identification of appellant in the third photo lineup, Shine would have nonetheless identified appellant in court as well as in the second photo lineup. Therefore, appellant cannot prove prejudice here.
 {¶ 65} Third, appellant argues that the court should not have permitted the identification of him by Kim Stone because her identification was a result of seeing media reports with his picture and describing him as the "south side rapist." Additionally, he points to Stone's testimony that she complied with her attacker's instructions not to look at him. (Tr. 380).
 {¶ 66} Stone also picked appellant out of a photo lineup. (Tr. 367). However, she did so after she saw appellant's picture in the newspaper as being the south side rapist. (Tr. 382). Stone stated that as soon as she saw appellant's picture, she recognized him as the man who assaulted her. (Tr. 382).
 {¶ 67} Stone had an opportunity to view her attacker. She testified that although it was dark, she looked at appellant. (Tr. 363). Stone stated that she knew that if she saw her attacker again, she would know it was him. (Tr. 363). Stone did testify that at one point during her struggle with her attacker, he ordered her not to look at him and she complied. (Tr. 379-80). However, she also stated that while she did not stare at him, she got glances of him in the light from the porch. (Tr. 379).
 {¶ 68} Given Stone's testimony that she looked at her attacker, that there was some light from the porch, and that she knew she could identify her attacker if she *Page 15 
saw him again, the court did not err in allowing Stone's identification of appellant. The facts that it was dark out and that Stone did not stare at her attacker go to the reliability of her identification, not to its admissibility. Furthermore, Stone stated that as soon as she looked at appellant's picture in the newspaper, she knew he was the man who had attacked her.
 {¶ 69} Accordingly, appellant's third assignment of error is without merit.
 {¶ 70} Appellant's fourth assignment of error states:
 {¶ 71} "THE TRIAL COURT ERRED IN ADMITTING THE BUCCAL SWABS OBTAINED FROM DEFENDANT/APPELLANT IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION."
 {¶ 72} Appellant argues that the trial court should not have admitted the oral swabs taken from him because there was no evidence that police had a search warrant to take saliva samples from him.
 {¶ 73} Again appellant did not raise an objection in the trial court regarding the DNA sample police took from him. Thus, this assignment of error will be reviewed for plain error.
 {¶ 74} The Fourth Amendment protects citizens from unreasonable searches and seizures. Maryland v. Buie (1990), 494 U.S. 325, 331,110 S.Ct. 1093, 108 L.Ed.2d 276. Warrantless searches are per se unreasonable unless they fall within an exception to a search warrant.Katz v. U.S. (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576.
 {¶ 75} Consent is a valid exception. State v. Ludington (Aug. 28, 2000), 7th Dist. No. 99-CO-13; Schneckloth v. Bustamonte (1973),412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854. "To rely on the consent exception of the warrant requirement, the state must show by `clear and positive' evidence that the consent was `freely and voluntarily' given."State v. Posey (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61, quotingBumper v. North Carolina (1968), 391 U.S. 543, 548, 88 S.Ct. 1788,20 L.Ed.2d 797. Clear and positive evidence is not significantly different from clear and *Page 16 
convincing evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. State v. Ingram (1992), 82 Ohio App.3d 341,346, 612 N.E.2d 454. Whether the defendant gave consent voluntarily, as opposed to being coerced or placed under duress, is a question of fact to be determined by the totality of the circumstances.Ludington, 7th Dist. No. 99-CO-13; Schneckloth, 412 U.S. at 227.
 {¶ 76} In this case, the evidence demonstrates that police did not need a warrant to swab appellant's mouth for DNA because he consented to this search. Detective Ellis testified as follows:
 {¶ 77} "I then asked him [appellant] if he would consent to a voluntary oral swabbing of his mouth for a DNA comparison. Officer Maulden, who was the crime lab tech that was present for the voluntarysubmission of that, and Officer Maulden did conduct the testing with the oral swab, which is a Q-Tip that they rub." (Emphasis added; Tr. 230).
 {¶ 78} Thus, Detective Ellis testified that appellant voluntarily submitted to the oral swabbing of his mouth. No evidence was presented to the contrary. Nothing in the record suggests that appellant was coerced to give the DNA sample or that he was placed under duress. Since the only evidence on the subject clearly demonstrates that appellant consented to the DNA sample, the trial court did not err in admitting the DNA evidence. Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 79} Appellant's fifth assignment of error states:
 {¶ 80} "THE STATE OF OHIO FAILED TO ESTABLISH PROPER VENUE."
 {¶ 81} Appellant argues here that the state failed to establish that the crimes occurred in Mahoning County, Ohio.
 {¶ 82} Appellant did not raise this issue in the trial court. Thus, it too will be reviewed for plain error.
 {¶ 83} In reviewing whether the state has proved venue beyond a reasonable doubt, appellate courts should apply the sufficiency of the evidence standard of *Page 17 
review. State v. Penton (Apr. 7, 1993), 3d Dist. No. 9-91-25. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Smith (1997),80 Ohio St.3d 89, 113, 684 N.E.2d 668.
 {¶ 84} Venue is not a material element of the offense charged, but is a fact that the state must prove in criminal prosecutions unless it is waived by the defendant. State v. Headley (1983), 6 Ohio St.3d 475, 477,453 N.E.2d 716.
 {¶ 85} R.C. 2901.12(A) provides: "The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." Evidence that the crime was committed in the relevant county adequately establishes venue. State v. El-Amin, 6th Dist. No. L-05-1286, 2007-Ohio-3949, at ¶ 16.
 {¶ 86} In this case, the state had to establish venue regarding each of the four victims. It did so. Shine testified that her attack occurred by an abandoned house on West Boston Street in Mahoning County, Ohio. (Tr. 85). Stone testified that her attack occurred in the backyard of her apartment on Fernlee Avenue in Mahoning County, Ohio. (Tr. 353, 355-56, 369). Howard testified that her attack occurred at her house on Hudson Street in Mahoning County, Ohio. (Tr. 134). And Flores testified that her attack occurred at her house on West Boston Street in Mahoning County, Ohio. (Tr. 179-81, 190).
 {¶ 87} Contrary to appellant's assertion, each of the four victims testified that their attacks occurred in Mahoning County, Ohio. This established venue. Accordingly, appellant's fifth assignment of error is without merit.
 {¶ 88} Appellant's sixth assignment of error states:
 {¶ 89} "THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON DEFENDANT/APPELLANT'S RIGHT TO BE PRESUMED INNOCENT AND DEFENDANT/APPELLANT'S RIGHT TO REMAIN SILENT." *Page 18 
 {¶ 90} Appellant argues that the trial court's instructions to the jury failed to inform them of the presumption of innocence in accordance with R.C. 2938.08. Additionally, he asserts the instructions do not explain to the jury his right to remain silent at trial.
 {¶ 91} Once again, appellant did not object to the jury instructions. Thus, this assignment of error will be reviewed for plain error.
 {¶ 92} R.C. 2938.08 provides:
 {¶ 93} "A defendant in a criminal action is presumed to be innocent until he is proved guilty of the offense charged, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he shall be acquitted. The presumption of innocence places upon the state (or the municipality) the burden of proving him guilty beyond a reasonable doubt.
 {¶ 94} "In charging a jury the trial court shall state the meaning of the presumption of innocence and of reasonable doubt in each case."
 {¶ 95} Regarding the presumption of innocence, the trial court specifically instructed the jury:
 {¶ 96} "The defendant is presumed innocent unless or until his guilt is established by proof beyond a reasonable doubt. In other words, the defendant must be found not guilty unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged against him in the indictment." (Tr. 640).
 {¶ 97} And regarding appellant's right not to testify, the court instructed the jury:
 {¶ 98} "As you were previously informed, it is not necessary that the defendant take the witness stand in his own defense. He has a constitutional right not to testify. The fact that he chose not to testify may not be considered by you for any purpose." (Tr. 646). *Page 19 
 {¶ 99} As these instructions demonstrate, the trial court properly instructed the jury on both the presumption of innocence and appellant's right not to testify. Accordingly, appellant's sixth assignment of error is without merit.
 {¶ 100} Appellant's seventh assignment of error states:
 {¶ 101} "THE STATE OF OHIO FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT A FINDING OF GUILT BEYOND A REASONABLE DOUBT AS TO THE IDENTITY OF THE PERPETRATOR OF THE CRIMES ALLEGED AND/OR FAILED TO PRESENT SUFFICIENT EVIDENCE AS TO ALL ELEMENTS OF COUNTS ONE AND TWO."
 {¶ 102} In this assignment of error, appellant argues that there was not sufficient evidence from which to conclude that he was the perpetrator of the rapes and the attempted rape.
 {¶ 103} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.State v. Smith (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668. In essence, sufficiency is a test of adequacy. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Smith, 80 Ohio St.3d at 113.
 {¶ 104} As to the first three victims, the jury convicted appellant of rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(4).
 {¶ 105} R.C. 2907.02(A)(2) provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 106} R.C. 2905.01(A)(4) provides in pertinent part: *Page 20 
 {¶ 107} "(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 108} "* * *
 {¶ 109} "(4) To engage in sexual activity, * * * with the victim against the victim's will."
 {¶ 110} In regard to the first three victims, appellant does not assert that the state failed to prove that these offenses were committed against each of the three victims. Instead, he argues that the state did not prove that he was the perpetrator of the crimes.
 {¶ 111} We will address the evidence as to each victim separately.
 {¶ 112} Shine was the first victim. She testified that as she was walking down Hillman Street a man approached her and started up a conversation with her. (Tr. 71). The two talked and walked for five to ten minutes. (Tr. 90). The man eventually fell behind Shine and grabbed her. (Tr. 73). The two struggled and the man was able to drag Shine behind a house. (Tr. 73-74). The man hit Shine in the face and raped her. (Tr. 76-77).
 {¶ 113} Shine picked appellant out of a photo lineup as her attacker. (Tr. 232). And she identified appellant in court. (Tr. 85). As discussed in detail in appellant's third assignment of error, Shine had ample opportunity to observe appellant as the two walked down the street together. In addition to Shine's identification of appellant, DNA evidence also connected appellant to Shine's rape. Chad Britton, a forensic scientist at BCI, testified that he found semen on vaginal swabs taken from Shine. (Tr. 467). Edelheit, the BCI DNA analyst, testified that appellant could not be excluded as the source of the semen found on the swabs. (Tr. 493). Edelheit testified that the chance of the semen belonging to someone other than appellant was one in 95 sextillion, 150 quintillion. (Tr. 494). He stated that it would take about a trillion earths to come up with that many people. (Tr. 494). *Page 21 
 {¶ 114} Given Shine's identification of appellant and the overwhelming DNA evidence, there is no question that the state presented competent, credible evidence that appellant was the man who raped and kidnapped Shine.
 {¶ 115} Stone was the second victim. She testified that one night when she came home, she realized she was locked out of her house. (Tr. 353). After waiting at her neighbor's house for awhile, Stone decided to sit outside on her porch and wait for her boyfriend to return home with a key. (Tr. 353-54). She then decided to go back to her neighbor's house. (Tr. 354). As she walked down her driveway, Stone saw a man standing there. (Tr. 354). They struck up a brief conversation. (Tr. 355). Stone turned her back to the man for a second and he grabbed her. (Tr. 355). The man dragged her to the backyard. (Tr. 355). The man then forced Stone to perform oral sex on him. (Tr. 356-57).
 {¶ 116} Stone picked appellant out of a photo lineup as her attacker. (Tr. 367). She also identified him in court. (Tr. 366). As discussed above, Stone had a sufficient opportunity to view her attacker even though it was dark out. Furthermore, Britton testified that he found semen on the oral swab taken from Stone. (Tr. 474). Edelheit then testified that appellant could not be excluded as the source of the semen found on the swab taken from Stone. (Tr. 496). Edelheit further testified that the chance of the same DNA belonging to anyone else was one in 26 quadrillion, 460 trillion. (Tr. 497).
 {¶ 117} Based on Stone's identification of appellant along with the strong DNA evidence connecting appellant to the rape, the state presented competent, credible evidence that appellant was the man who raped and kidnapped Stone.
 {¶ 118} Howard was the third victim. Howard testified that as she approached the back door of her house, a man came up behind her and grabbed her. (Tr. 122). The two struggled and made their way from her back door and toward her neighbor's house. (Tr. 123). The man hit Howard in the face with a gun. (Tr. 123). When it became apparent that he was going to rape her, Howard asked if she could get a condom. (Tr. 124). The man agreed and followed Howard into her house. (Tr. 125). *Page 22 
Howard located a condom. (Tr. 126). The man used the condom and raped her. (Tr. 126-28).
 {¶ 119} Howard was not able to identify her attacker. However, DNA evidence established a connection with appellant. Britton testified that seminal fluid was found on the vaginal swab taken from Howard, but that no semen was found. (Tr. 476, 483). Edelheit testified that with the tests that he runs at BCI, he was unable to detect any DNA on the swabs taken from Howard. (Tr. 499). Therefore, he sent the samples to Orchid Cellmark, which has the ability to conduct a different kind of testing. (Tr. 499-500). Cassie Johnson, the Orchid Cellmark DNA analyst, tested the swabs from Howard. She testified that she performed Y-STR testing, which examines the presence of male DNA. (Tr. 43). Johnson testified that based on her results, appellant or a male relative of appellant's could not be excluded as a contributor of the DNA found on the swab from Howard. (Tr. 47). She also stated that the partial profile she was able to obtain had never been observed before in her database. (Tr. 47). Johnson stated that all males in the same lineage will have the same Y-chromosome profile. (Tr. 65). She explained that was why she could not uniquely identify appellant from others in his paternal lineage. (Tr. 64-65). Instead, Johnson explained, she used the term "cannot be excluded." (Tr. 65).
 {¶ 120} Additionally, although Howard did not see her attacker's face, she testified that he was wearing a dark "hoodie," either blue or black, and that he had a thin build. (Tr. 124, 129). This corroborated the other victims' descriptions of appellant. Shine described appellant as being skinny and stated that he was wearing a dark blue hoodie when he assaulted her. (Tr. 71, 73, 79, 91). Flores testified that appellant was wearing a royal blue hoodie both on the night he broke into her house and on the day she identified him. (Tr. 180, 189). And Stone described appellant as being thin. (Tr. 354).
 {¶ 121} This evidence is not as overwhelming as was the evidence for the previous two victims. Nonetheless, the DNA testimony tends to indicate that appellant was the source of the DNA found on the vaginal swabs taken from Howard. *Page 23 
And the limited description Howard was able to give of her attacker matched appellant's description. Viewing this evidence in the light most favorable to the state, as we are required to do, it supports a finding that appellant was the man who raped and kidnapped Howard.
 {¶ 122} Flores was the fourth victim. The charges relating to her differed from those pertaining to the other victims. As to Flores, the jury convicted appellant of aggravated burglary in violation of R.C. 2911.11(A)(1) and attempted rape in violation of R.C. 2923.02(A) and R.C. 2907.02(A)(2).
 {¶ 123} R.C. 2911.11(A)(1) provides in relevant part:
 {¶ 124} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
 {¶ 125} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another."
 {¶ 126} R.C. 2907.02(A)(2) is the rape statute set out above and R.C. 2923.02(A) provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 127} Here, in addition to taking issue with his identity, appellant also argues that the state failed to present any evidence of the purpose to commit rape and failed to present evidence of physical harm or attempted physical harm.
 {¶ 128} Flores testified that while she was relaxing on her couch around 11:30 p.m., she saw a figure in her doorway. (Tr. 181, 185, 195). She stated that it was dark. (Tr. 196). At first, she thought it was her cousin. (Tr. 181). But then the man "rushed" her. (Tr. 181). Flores was in her pajamas. (Tr. 196). She was lying on her back with one of her legs on the back of her couch. (Tr. 184). The man jumped on her. (Tr. 201). Flores stated that the man placed his leg on top of her leg, pinned her shoulders down with his hands, and kissed her. (Tr. 181, 202). Flores managed *Page 24 
to get the man off of her. (Tr. 181-82). She yelled and screamed at the man and managed to get him out of her house. (Tr. 182). She identified appellant as the man who attacked her. (Tr. 183-84). Flores testified that she never gave appellant permission to put his hands on her or to kiss her. (Tr. 190).
 {¶ 129} Flores further testified that appellant entered her house through her children's bedroom window, because that window was wide open and her other doors and windows were locked. (Tr. 185).
 {¶ 130} As discussed in detail previously, when appellant entered her house, it was the third time Flores had seen him that day. First, she saw him at her neighbor's house earlier in the day. Then she saw him when he knocked on her door about an hour before he broke in. Thus, Flores had ample time to look at appellant so that she could correctly identify him. Therefore, there was sufficient evidence that appellant was the man who broke into Flores's house and assaulted her.
 {¶ 131} "Attempted rape requires that the actor (1) intend to compel submission to sexual conduct by force or threat, and (2) commit some act that convincingly demonstrate[s] such intent." State v. Davis (1996),76 Ohio St.3d 107, 114, 666 N.E.2d 1099. Flores's testimony indicated that while she was in her pajamas lying on her couch in the dark, appellant rushed her, jumped on her, put his leg on top of her leg, pinned her down, and then kissed her while he was on top of her. Basically, appellant pinned Flores, held her down, and kissed her. Viewing this evidence in the light most favorable to the state, it established that appellant took a substantial step towards engaging in sexual conduct with Flores against her will thus, establishing the attempt. Additionally, the evidence that appellant rushed Flores, jumped on her, and pinned her down against her will shows an attempt to inflict physical harm.
 {¶ 132} Based on the above, the state presented sufficient evidence that appellant burglarized Flores's home and attempted to rape her.
 {¶ 133} Accordingly, appellant's seventh assignment of error is without merit.
 {¶ 134} Appellant's eighth assignment of error states: *Page 25 
 {¶ 135} "THE TRIAL COURT ERRED IN ADMITTING IMPERMISSIBLE OTHER ACTS/CHARACTER EVIDENCE OF DEFENDANT/APPELLANT IN VIOLATION OF EVIDENCE RULE 404 AND BY ADMITTING IMPERMISSIBLE HEARSAY TESTIMONY REGARDING THOSE OTHER ACTS/CHARACTER OF DEFENDANT/APPELLANT IN VIOLATION OF EVIDENCE RULE 802."
 {¶ 136} Here, appellant argues that the trial court improperly allowed testimony regarding his bad character and his prior crimes and bad acts. Specifically, appellant points to testimony that he was in jail at the time of his indictment and that Shine was shown jail photos of him. (Tr. 99, 249, 258). And appellant points to testimony that his step-father made the statement that appellant engaged in the type of conduct alleged "all the time." (Tr. 183, 228-29).
 {¶ 137} Yet again, appellant did not object to these statements. Therefore, this assignment of error will be reviewed for plain error.
 {¶ 138} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid. R. 404(B). However, in this case, the testimony appellant takes issue with was not used to prove his character or to show that he acted in conformity with that character.
 {¶ 139} When discussing the people in the photo lineup, Shine simply mentioned that she thought that the pictures looked like they might have been juvenile court or jail photos. (Tr. 99). Additionally, Detective Ellis mentioned that when the warrant was issued for appellant's arrest in Shine's case, he was already in jail. (Tr. 249, 258).
 {¶ 140} This evidence was not introduced to prove appellant's character. Both the state and appellant's counsel questioned Shine about the photos used in the photo lineups. Shine was simply describing the types of photos she thought were used in the lineups. And Detective Ellis was merely describing how things proceeded in her investigation pertaining to Shine and at what point appellant was actually arrested. *Page 26 
 {¶ 141} Additionally, Flores testified that the day after appellant broke into her house, she found out where he lived. (Tr. 183). She then went to his parents' house and told them what happened. (Tr. 183). Flores stated that appellant's step-father told her to call the police because this was not the first time appellant had done something like this. (Tr. 183). Detective Ellis testified that Flores told her what appellant's step-father had said. (Tr. 228-29).
 {¶ 142} Likewise, this evidence was not used to prove appellant's bad character or that he acted in conformity therewith. Flores simply related the story of how she located appellant and when she contacted the police. And Detective Ellis just stated what occurred in her investigation, including what the victim, Flores, told her.
 {¶ 143} At the time they gave the testimony appellant now takes issue with, neither Shine, Flores, nor Detective Ellis was testifying as to appellant's character or how appellant behaved in general. Instead, they were each describing events in the investigation. Their testimony did not extend any further into a discussion of appellant's character. Thus, the trial court did not err in allowing this testimony. Accordingly, appellant's eighth assignment of error is without merit.
 {¶ 144} Appellant's ninth assignment of error states:
 {¶ 145} "DEFENDANT/APPELLANT'S TRIAL COURT COUNSEL WAS INEFFECTIVE."
 {¶ 146} Appellant argues here that his trial counsel was ineffective for numerous reasons. He points out that counsel failed to object to the numerous issues raised in this appeal. Therefore, he concludes that his counsel was ineffective.
 {¶ 147} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of *Page 27 
the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. Id. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different.Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
 {¶ 148} Appellant bears the burden of proof on the issue of counsel's effectiveness. State v. Calhoun (1999), 86 Ohio St.3d 279, 289,714 N.E.2d 905. In Ohio, a licensed attorney is presumed competent. Id.
 {¶ 149} Appellant does not assert any reason for his counsel's alleged ineffectiveness other than counsel's failure to raise objections to the issues he now raises on appeal. However, as this opinion has shown, these assignments of error are all without merit. Thus, no prejudice exists. Appellant raises numerous issues in this appeal that his counsel did not object to. However, many of them warranted no objection by counsel because there was no error to object to, i.e. venue was clearly established, jury instructions were proper, appellant consented to the DNA sample. Thus, appellant's counsel cannot be considered ineffective for failing to raise objections to these issues. And as demonstrated above, the state presented competent, credible evidence going to all elements of each offense. Thus, even if counsel had raised the objections appellant now contends he should have raised, there is no indication that the result of appellant's trial would have been any different. Accordingly, appellant's ninth assignment of error is without merit.
 {¶ 150} Appellant's tenth assignment of error states:
 {¶ 151} "THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE THE DEFENDANT/APPELLANT'S SENTENCES."
 {¶ 152} Appellant argues here that the trial court should have merged his sentences as to the crimes for each separate victim. He contends that the state failed to establish a separate animus for each kidnapping and each rape. *Page 28 
 {¶ 153} Appellant did raise the merger argument at his sentencing hearing. However, the trial court found that the sentences did not merge and subsequently sentenced appellant separately on each offense.
 {¶ 154} A trial court may not punish a defendant for multiple offenses if the defendant's actions constitute allied offenses of similar import.State v. Rance (1999), 85 Ohio St.3d 632, 636, 710 N.E.2d 699. However, if a defendant commits offenses of similar import separately or with a separate animus, he may be punished for both. Id., citing State v.Jones (1997), 78 Ohio St.3d 12, 13-14, 676 N.E.2d 80.
 {¶ 155} To determine whether two offenses are allied offenses of similar import the court must consider the following test: If the elements of the offenses correspond so that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import; but if the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends.State v. Cabrales, 118 Ohio St.3d 54, 2008-Ohio-1625, at paragraph one of the syllabus; Rance, at 636. When determining whether offenses are allied offenses of similar import, the elements of the offenses are to be compared in the statutory abstract. Cabrales, at paragraph one of the syllabus; Rance, at 637.
 {¶ 156} Rape and kidnapping can be allied offenses of similar import. Comparing the crimes of kidnapping and rape for purposes of determining whether they have the same animus, the Ohio Supreme Court restated its test as set out in State v. Logan (1979), 60 Ohio St.2d 126,397 N.E.2d 1345. In State v. Adams, 103 Ohio St.3d 508, 817 N.E.2d 29,2004-Ohio-5845, the Court stated:
 {¶ 157} "In [Logan], we established guidelines to determine whether kidnapping and rape are committed with a separate animus so as to permit separate punishment under R.C. 2941.25(B). We held in Logan that `[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, *Page 29 
there exists a separate animus as to each offense sufficient to support separate convictions.' Conversely, the Logan court recognized that where the asportation or restraint `subjects the victim to a substantial increase in risk of harm separate and apart from * * * the underlying crime, there exists a separate animus.'" (Internal citations omitted.) Id. at ¶ 90.
 {¶ 158} The Court then applied Logan without any reference to the test set out in Rance, supra. It did not address whether the elements of rape and kidnapping, when compared in the abstract, corresponded to such a degree that the commission of one would result in the commission of the other. It went directly to addressing whether the crimes were committed with a separate animus. Thus, the Court must have found that the elements of rape and kidnapping did correspond in the abstract or it would not have moved on to consider whether the crimes had a separate animus. Thus, we too will examine whether the crimes in this case each had a separate animus.
 {¶ 159} In Logan, the defendant produced a knife, held it to the victim's throat, forced her into an alley, around a corner, and down a flight of stairs, where he raped her at knifepoint. The Logan Court found that these actions did not demonstrate a separate animus for kidnapping separate from that of the rape: "[T]he restraint and movement of the victim had no significance apart from facilitating the rape. The detention was brief, the movement was slight, and the victim was released immediately following the commission of the rape."Logan, 60 Ohio St.2d at 127.
 {¶ 160} Conversely, in State v. Parker, 7th Dist. No. 03-MA-190,2005-Ohio-4888, at ¶ 27, this court found that the defendant restrained the victim's liberty when he choked her in the TV room and forced her from that room, upstairs to a bedroom against her will. We further found that the defendant restrained the victim's liberty after he committed the rape when he threatened to kill the children she was babysitting if she left the bedroom. Id. We stated that the defendant committed the rape when he forcefully engaged in intercourse with the victim against her will. Id. We determined that this act was separate from the kidnapping. Id. We concluded: *Page 30 
"Even if moving * * * [the victim] from the TV room to the upstairs bedroom could be viewed as being incidental to the rape, the restraint on her movement after the rape was completed was not." Id.
 {¶ 161} As to the first three victims, appellant was convicted of rape and kidnapping. We must examine the evidence as to each victim separately because it is possible that the counts may merge as to one victim but not as to another.
 {¶ 162} Shine testified that appellant grabbed her while the two were on the sidewalk. (Tr. 73). He then pulled her halfway up a driveway. (Tr. 74). Appellant then dragged Shine to the back of an abandoned house but they remained outside of the house. (Tr. 74). After appellant raped her, he repeatedly stomped on her head with his foot. (Tr. 77).
 {¶ 163} In Shine's case, although it seems that appellant's sole purpose of moving Shine was to facilitate the rape, appellant took the crime one step further. Instead of quickly releasing Shine after the rape, appellant repeatedly stomped on her head with his foot. As stated above, where the restraint of the victim subjects her "to a substantial increase in risk of harm separate and apart from * * * the underlying crime, there exists a separate animus." Adams, 103 Ohio St.3d at ¶ 90, citing Logan, supra. Here, appellant subjected Shine to an increased risk of harm, separate from that of the rape, when he stomped on her head after the rape was completed. Thus, a separate animus existed in Shine's case.
 {¶ 164} Stone stated that appellant grabbed her as she attempted to descend the stairs from her neighbor's apartment. (Tr. 355). He put her in a chokehold and dragged her into the backyard by the side of a garage. (Tr. 355). After appellant raped her, he told Stone to lie down on the ground, which she did. (Tr. 357). The whole time, Stone thought appellant had a gun. (355-57).
 {¶ 165} In Stone's case, her release after the rape was not immediate. Appellant instructed her to lie on the ground. Stone believed that appellant had a gun. Hence, Stone's liberty was restrained after the rape because she would have feared that appellant would shoot her if she got up off the ground and went for help. *Page 31 
Thus, this incident is similar to that in Parker, supra. Therefore, a separate animus existed for the rape and the kidnapping.
 {¶ 166} Howard testified that as she approached the back door of her house, her attacker came up behind her and choked her. (Tr. 122). She fought and struggled with the man from her back door to between her house and her neighbor's house. (Tr. 123). All the while the man was choking her. (Tr. 123). The man hit her in the face with a gun. (Tr. 125). When she realized that the man was going to rape her, Howard asked if she could get a condom from her house. (Tr. 125). The man agreed, but threatened Howard that if anyone was in her house, he would kill her. (Tr. 125). The man then took Howard by the throat and walked her into her house at gunpoint. (Tr. 125). After she retrieved the condom, the man raped her. (Tr. 128). When he finished, the man instructed Howard not to scream or follow him because there was somebody else waiting outside. (Tr. 130). Howard subsequently waited while the man left and then ran to her neighbor's house. (Tr. 130).
 {¶ 167} In Howard's case, Howard's assailant clearly threatened her after the rape. He told her not to leave her house to follow him and not to yell for help because there was someone else outside waiting. Again, this incident is similar to that in Parker, supra, because the attacker restrained the victim's liberty even after the rape was concluded and the attacker left the house. In addition, there was prolonged restraint before the rape. Therefore, a separate animus existed here too.
 {¶ 168} The merger issue differs in Flores's case. As to Flores, appellant was convicted of aggravated burglary and attempted rape.
 {¶ 169} The aggravated burglary statute under which appellant was convicted reads:
 {¶ 170} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: *Page 32 
 {¶ 171} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another." R.C. 2911.11(A)(1).
 {¶ 172} The attempt statute under which appellant was convicted reads: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).
 {¶ 173} And the rape statute as pertaining to appellant reads: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2).
 {¶ 174} Here, we can apply the test set forth by the Ohio Supreme Court in Rance, 85 Ohio St.3d 632 and clarified in Cabrales,118 Ohio St.3d 54, 2008-Ohio-1625. Thus, we must determine whether aggravated burglary and attempted rape are allied offenses of similar import. If the elements of the offenses correspond so that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import. Rance, at 636. However, if the elements do not so correspond, the offenses are of dissimilar import. Id.
 {¶ 175} The elements of the two offenses here do not correspond in such a way as to make them allied offenses of similar import. Each crime can be committed separately from the other. Appellant satisfied the elements of aggravated burglary when he broke into Flores's house through her children's bedroom window, with the purpose to commit rape in the house, and when he "rushed" Flores, which could be viewed as an attempt to inflict physical harm. Appellant did not commit the attempted rape until he put his leg on top of Flores's leg, pinned her down, and kissed her while she lay on her couch. Because the elements of these two offenses do not coincide, they are not allied offenses of similar import. Other courts have also reached this conclusion. See State v.Lamberson, (March 19, 2001), 12th Dist. No. CA2000-04-012 (aggravated burglary and rape are not allied offenses of similar import); State v.Moss (Dec. 28, 1999), 10th Dist. No. 99AP-30 (aggravated burglary and attempted rape are not allied offenses of similar import). *Page 33 
 {¶ 176} Accordingly, appellant's tenth assignment of error is without merit.
 {¶ 177} Appellant's eleventh assignment of error states:
 {¶ 178} "DEFENDANT/APPELLANT WAS DENIED A FAIR SENTENCING DUE TO THE CUMULATIVE EFFECT OF THE TEN ASSIGNMENTS OF ERROR AS SET FORTH HEREIN."
 {¶ 179} Finally, appellant argues that the cumulative effect of the alleged errors he has set out deprived him of a fair trial.
 {¶ 180} "The cumulative error doctrine refers to a situation in which the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial. To affirm a conviction in spite of multiple errors, we must determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. The errors may be considered harmless if there is overwhelming evidence of guilt, if Appellant's substantial rights were not affected, or if there are other indicia that the errors did not contribute to the conviction." (Internal citations omitted.) State v. Anderson, 7th Dist. No. 03-MA-252, 2006-Ohio-4618, at ¶ 80.
 {¶ 181} As discussed above, the errors appellant alleges do not have merit. Thus, no cumulative error exists. Accordingly, appellant's eleventh assignment of error is without merit.
 {¶ 182} For the reasons stated above, the trial court's judgment is hereby
affirmed.
Waite, J., concurs.
DeGenaro, P.J., dissents with attached concurring in part and dissenting in part opinion. *Page 34